391 P.2d 567

Harold PETERSON and Viola Peterson,
his wife, Appellants,

v.

SALT RIVER PROJECT AGRICULTURAL
IMPROVEMENT & POWER DIS-
TRICT, Appellee.

No. 7174.

Supreme Court of Arizona.

En Banc.

April 16, 1964.

Bayham & Huffsteter, Phoenix, for appellants.

Jennings, Strouss, Salmon & Trask, by Charles R. Esser, Phoenix, for appellee.

BERNSTEIN, Justice.

This is an appeal from a directed verdict in favor of the defendant in a motor vehicle accident case.

Harold Peterson and his wife Viola sued the Salt River Project Agricultural Improvement & Power District for damages arising from a collision occurring at the intersection of Twenty-second Street and Lincoln Street in Maricopa County. An

automobile being operated by Harold Peterson collided with the end of a power pole being towed by a semi-truck and pole trailer owned by the defendant Power District and being driven by Harry Marshall.

The evidence, which was largely uncontradicted, shows that Marshall, an employee of the defendant was driving a 1954 Cabover semi-truck towing a pole trailer upon which was loaded a power pole approximately 70 feet in length. The semi-truck was traveling in a southerly direction on Twentieth Street north of Lincoln Street. The pole trailer was expanded to its full length of 35 feet. The pole projected over the end of the trailer approximately 30 feet. A square red flag was attached to the end of the pole by a 12 inch spreader wire. Marshall testified that this flag was 12 inches square.

After Marshall crossed Buchanan Street, the first street north of Lincoln, he observed in his rear view mirror a gray car turn right onto Buchanan Street. At that time he made a right hand turn signal at a point approximately 200 feet north of Lincoln Street, indicating his intention to turn right onto Lincoln. This signal was made with an electric arm signal approximately 18 inches in length. At this time he was traveling approximately 15 to 20 miles an hour. At the same time he made his right turn signal, he applied the brakes and continued to slow down until he reached the Lincoln Street intersection. During the period of his travel to Lincoln Street after he had put up his right turn signal, he again looked in his rear view mirror and observed no car close behind him or at least not within a distance of 100 feet to the north. As he approached the Lincoln Street intersection, he had slowed to approximately 5 miles per hour and he shifted down to third gear. He proceeded south past the center line of Lincoln Street and then commenced the right turn of his cab into the left portion of Lincoln, but the front of his cab remained on the right hand side of Twentieth Street. Just before he made his right turn onto Lincoln, he observed that there was no traffic toward him or from his right or left on Lincoln. From six to seven seconds after he had commenced his turn onto Lincoln and after his cab had travelled a distance of 35 to 40 feet, he felt a slight nudge and brought his vehicle to a halt within 3 to 4 feet. Upon looking behind him he observed that the end of the pole had pivoted through the right windshield (at approximately a 45 degree angle) of the car operated by Peterson. The pole struck Mrs. Peterson, who was riding in the middle of the front seat, in the side of the face.

The Deputy Sheriff who investigated the accident, testified that he made measurements of the vehicles at rest after the accident and found that the plaintiffs' car had come to rest on the left side of the road with both left wheels 2 feet west of the east or

left edge of Twentieth Street. The left front wheel was 35 feet north of the north edge of Lincoln. He determined that 2 feet 6 inches of the pole went through the windshield of the automobile. He testified that he observed tire scuff marks on the ground indicating that the plaintiffs' vehicle had slid slightly sideways while it was going forward after the point of impact, but that the scuff marks left by the Peterson car were entirely on the left hand side of the pavement. He determined that the point of impact between the end of the pole and the windshield was 9 feet west of the east or left edge of Twentieth Street and 44 feet 6 inches north of the north edge of Lincoln.

Plaintiff Harold Peterson testified that he and his wife and children were driving south on Twentieth Street at approximately 5:30 P.M. on the same date. He was driving a 1948 Chevrolet. Mrs. Peterson was seated next to him with his daughter Helen on the outside next to the door and his daughter Caroline in the back. He further testified that he turned onto Twentieth Street from Madison and that as he first commenced traveling south he noticed the semi-truck and pole trailer and a gray car also proceeding south ahead of him on Twentieth Street. The semi-truck was going over the railroad tracks at the time and that the gray car was behind the semi-truck. At this point the railroad track was a block and a half ahead of where he observed it. He and his wife saw the pole on the back of the pole trailer bouncing up and down and "we spoke of it as being hazardous looking." He testified that he observed the gray car turn off onto Buchanan, just below the railroad tracks, to the west, and that he was traveling at that time at a speed of approximately 18 to 20 miles per hour as he approached Buchanan. At the point where the gray car turned onto Buchanan he was "a car length or two behind it". He slowed down to permit the car to make the turn onto Buchanan and then proceeded south on Twentieth Street at about 15 to 18 miles per hour. He still observed the semi-truck and pole trailer ahead of him as he crossed the intersection of Buchanan and Twentieth Street at a distance of "approximately a car length or two". He was approximately one-third of the distance between Buchanan and Lincoln when the "trailer suddenly slowed down". His counsel asked him the following question: "I take it you did not observe any arm signal", and he answered, "No, sir". He also testified that he did not observe anything attached to the pole in any manner whatsoever and at no time was there visible to him a red flag attached to the pole. He testified that he then noticed the pole "going to the right"; that he put on his brakes and "it swung around to the left and that is when it went through my windshield, approximately a 45 degree angle".

At the close of the plaintiffs' case, the defendant moved the court to instruct the jury to return a verdict for the defendant

upon the grounds that upon the undisputed evidence as presented during the plaintiffs' case there was no evidence of any negligence on the part of the defendant which proximately caused the injuries sustained by the plaintiffs and that as a matter of law the plaintiffs had failed to sustain the burden of proof of negligence of the defendant. The motion was granted.

This Court has consistently held that the trial court is justified in directing a verdict only where the evidence is insufficient to support a contrary verdict or so weak that the Court would feel constrained to set aside such a verdict on a motion for a new trial. In viewing the evidence to determine whether it is such that reasonable men might conclude the fact of negligence, such evidence must be viewed in a light most favorable to him who urges that it be submitted to the jury as against the party who urges that no jury question has been presented. Golfinos v. Southern Pacific Company, 86 Ariz. 315, 318, 345 P.2d 780 (1959).

While the evidence in this case is not conflicting in any important particular, there is room here for fair and reasonable men to differ in the inferences to be drawn from the evidence.

In Bryan v. Southern Pacific Company, 79 Ariz. 253, 260, 286 P.2d 761, 765, 50 A.L.R.2d 1 (1955), in holding that the safety rules of the employer were admissible, this court said:

"Negligent conduct may be predicated upon the doing of an act which a reasonable man *should realize* involves an unreasonable risk of causing harm to another. Restatement of the Law of Torts, Section 284. It is the risk reasonably to be perceived which defines the duty to be obeyed." (Emphasis in original).

In Dorris v. Bridgman & Co., 296 Pa. 198, 145 A. 827 (1929), a pedestrian was struck by iron pipes overhanging 5 feet from a trailer. The court said at page 829 of 145 A.:

"As plaintiff came to the curb, she stepped down two feet, and waited for the truck to pass. The truck pulled out of the car tracks to get around a street car, and then swung back toward the tracks. This caused a fan-like motion of the pipes in the rear of the trailer, with the projection out 2 feet as a hook; its movement was like the swinging of a scythe, mowing down objects in the way. In this zigzag motion of the car, it caught the plaintiff."

\* \* \* \* \* \*

"Where a truck *and trailer* travel on a highway, the *zone of apprehensible danger* includes, not only objects immediately in front, but such objects as may come within *the swinging, swaying, or swerving radius of the trailer*. (Emphasis supplied.)"

**6**

In order to determine whether this case should be submitted to the jury, it is unnecessary to determine whether defendant's rig was a "dangerous instrumentality". This may be one of the fact questions properly within the province of the jury. Since the question has been raised by appellant, however, it should be pointed out that 70-foot poles similar to the one being transported in this case have been held to be "dangerous instrumentalities." Barzen v. Kepler, 125 Kan. 648, 266 P. 69 (1928). See also Moore v. Nisley, 133 Neb. 474, 275 N.W. 827 (1937) citing both Dorris and Barzen with approval. Improvements in the design of pole carrying vehicles may have removed them from any category of "unusual and dangerous instrumentalities". But the nature of the 70-foot pole itself, with a 30-foot overhang, has not changed. Both our case and Barzen involve 70-foot poles with a 30-foot overhang.

The Illinois Appellate Court in an accident case where the trailer broke loose from the truck, Barango v. E. L. Hedstrom Coal Co., 12 Ill.App.2d 118, 138 N.E.2d 829, 833 (1956), said:

"* * * Irrespective of any statutory requirement, a truck operator engaged in towing another vehicle is performing an act of potential danger to other operators and pedestrians, and persons using a dangerous instrumentality are required to exercise care commensurate with the danger to be apprehended, in order to prevent injury to others. Staples v. Spelman, 53 R.I. 244, 165 A. 783."

■ Leaving aside issues with regard to the exclusion of expert and other evidence and the manner of examining the driver at the trial, the trial judge was in error in determining that this record does not contain sufficient evidence of negligence to take the case to the jury. The driver testified that he "turned sharply to the right":

"Q Would you describe that turn as to whether you turned sharply to the right or made an arc to the right?

"A I turned sharply to the right."

The jury might find that, when handling a pivoted rig, a turn should always be made in the widest arc possible. See Asphalt Service Co. v. Thomas, 198 Va. 490, 95 S.E.2d 141 (1956). When the rear of the trailer swings out on a sharp turn, an accident such as happened here is inevitable if anything is in the way. There is also the danger that the load will jackknife. See Note, Liability for Accident from "jackknifing" of Trailers or the like, 68 A.L.R.2d 353 (1959). The jury might find that making a sharp turn with a pivoted rig such as this is negligence, and is never done by prudent drivers.

■ Much is made of the contention that defendant complied with A.R.S. § 28–

935 requiring a 12 inch x 12 inch red flag at the end of the pole. The flag was found after the accident inside or on the hood of plaintiffs' car. Defendant is being sued for failure to exercise due care in the operation of the vehicle. The jury may find that under certain circumstances the standard of due care requires more than compliance with the minimum standards of a statute. Golfinos v. Southern Pacific Co., supra. See also Holloway v. Pure Oil Co., 17 La.App. 584, 136 So. 748 (1931). Where an extra large rig is involved, the jury might also find that a helper, perhaps riding the rear end, a follow up car, or any other additional safety precaution would have been adopted by a reasonable power company before launching a 70-foot pole with a 30-foot overhang on the public highways.[1]

This Court has recently considered the problem of the relation of safety statutes and regulations to the proof of common law negligence. In Alires v. Southern Pacific Company, 93 Ariz. 97, 110, 378 P.2d 913 (1963) we said:

"Common law negligence is the failure to act as a reasonable and prudent

person would act in like circumstances. Salt River Valley Water Users Ass'n v. Compton, 39 Ariz. 491, 8 P.2d 249. 'Negligence is simply determined by whether under the conditions then and there existing one should realize there is or should be anticipated an unreasonable risk of harm to one in the position of the injured person.' Downs v. Sulphur Springs Valley Electric Co-op., Inc., 80 Ariz. 286, 297 P.2d 339. While from the failure to heed a statute or regulation the law conclusively infers a want of reasonable care, from the non-existence of statutes or regulations no rational inference concerning the care a reasonable prudent man should use can be drawn.[12] The care

"12. From the lack of regulations the jury might infer that the corporation commissioners were of the opinion that a flagman, gates, automatic signals or warning or protective devices or a lower rate of speed than 79 miles per hour were unnecessary to reasonably protect the traveling public at the Thirty-fifth Avenue Crossing. The opinion of the commissioners if offered in person is expressly prohibited by Wolfswinkel v. Southern Pacific Company, supra. [81 Ariz. 302, 305 P.2d 447] An inference as to their opinion, which inference may be contrary to the facts and cannot be rebutted, is to be doubly condemned." (Footnote in original).

1. As the Pennsylvania court said in Dorris, supra 145 A. at page 880: "It is urged, if we invoke these rules as to trucks and busses, we create the obligation of an insurer. We do not agree. First, the user must know the space his truck, trailer, or projections occupy; second, the pedestrian must be observant.

Whether he saw a projection and knew the extent of its sweep is for the jury. The duty as to seeing a projection is not, however, as rigid as that of seeing the truck approach. The pedestrian, of course, cannot hold the user liable, if, without observation, he suddenly darts in front of the truck or projection. Driv-

required is dependent upon the known and the reasonably foreseeable conditions existing at the crossing. That statutes or regulations did not exist cannot afford any guide by which defendants as reasonable and prudent men could have determined appropriate conduct or which the jury, in retrospect, might conclude defendants did or did not act reasonably and prudently under the circumstances."

It is a jury question whether compliance with a statute is enough to meet the standard of due care which applies in actions for damages for negligence. Evidence of non-compliance is generally admissible where the statute is a relevant safety statute. It is for the jury to determine if a reasonable man, in the employ of the power company, would have sent out a follow-up truck, or adopted some other safety precaution in connection with the operation of this rig. Negligence by any employee of the power district, if it was the proximate cause of the accident would be sufficient to impose liability.

Much is made of Callahan v. David M. Oltarsh Iron Works, Sup., 112 N.Y.S. 1102 (1908) in the briefs, because of the great similarities between the accident there and this accident. Callahan involved horse drawn vehicles, and the pipes which swung

out and killed the plaintiffs' horse had an overhang of only 10 feet, but it is virtually the accident before us in slow motion and in miniature. The physical principles involved in turning a team drawing a wagon, and the resultant swing out of the wagon with an overhanging load, are identical with those involved in turning a pivoted semi-trailer rig. If the struck vehicle lawfully reaches the position in which it is struck it is immaterial whether it reaches that position by approaching from the front as in Callahan or from the rear as in this case. The important holding in Callahan is that, in the situation common to both that case and this, where the driver of the pivoted vehicle gives proper signals that he is about to make a turn, the jury may find that it is *not contributory negligence* if the driver of the struck vehicle fails to see the signal. We do not reach this problem here. Denny v. Strauss & Co., Sup., 109 N.Y.S. 26 (1908) is another horse and wagon case, where a parked vehicle was struck, illustrating the pivot problem.

 Since we hold that there was ample evidence of negligence to take this case to the jury on the record made, it is unnecessary to examine in detail plaintiffs' exceptions to the exclusion of other

---

ers of these motor vehicles on their part may protect themselves, as other transportation companies do, by reducing the

speed of the truck, and by placing a man in the rear to warn pedestrians of danger."

evidence, or to his asserted right to examine defendant's driver under Rule 43 (g), 16 A.R.S. However, since the case must be tried again, we should observe (1) when properly offered, expert testimony would be admissible, Allied Van Lines v. Parsons, 80 Ariz. 88, 293 P.2d 430, 433 (1956); (2) Rule 43(g) of the Rules of Civil Procedure, does not permit examination of a truck driver with no managerial responsibilities, as an adverse or hostile witness, Slow Development Co. v. Coulter, 88 Ariz. 122, 353 P.2d 890 (1960).

The case is remanded for a new trial in accordance with the views expressed herein.

LOCKWOOD, V. C. J., STRUCK-MEYER, J., and T. J. MAHONEY, Superior Court Judge, concur.

NOTE: Justice JENNINGS, having disqualified himself, the Honorable T. J. MAHONEY, Judge of the Superior Court of Pinal County, Arizona, was called to sit in his stead and participate in the determination of this appeal.

UDALL, Chief Justice (dissenting).

I dissent from the majority opinion in this case. The trial court took the view that there was no evidence to show that any negligence of defendant had proximately caused plaintiff's injuries. While we recognize the possibility of more than one proximate cause, Nichols v. City of Phoenix, 68 Ariz. 124, 202 P.2d 201 (1949), it is equally well-established that contributory negligence, if itself a "proximate cause," operates as an absolute bar to recovery. Sanders v. Beckwith, 79 Ariz. 67, 283 P.2d 235 (1955). Comparative negligence, in other words, is not recognized in this state. These principles should be controlling here.

I have no quarrel with the statement of facts set out in the court's opinion but its elaborate emphasis on detail is distracting from the salient features of the evidence. When defendant's driver slowed his vehicle and commenced a right turn off 20th Street, the rear of his load swung left. Plaintiff pulled over to the left side of the street to pass and ran into the end of the pole.

Classification of lawsuits is a delicate business. Precedents must be examined with care lest we create an intolerable conflict between legal rules and the demands of justice. From any effort to apply "general principles" of law there emerges a natural tendency to emphasize common factors of different cases while important distinctions go unnoticed or ignored. And the underlying policies which prompted an earlier result often escape the scrutiny which in light of altered conditions within the community as a whole they deserve.

These dangers are realized in the majority approach categorizing this appeal as a "pivot problem." The authorities cited

in support of that holding are easily distinguished from the case at hand. In *Dorris v. Bridgman & Co.*, a pipe had been carelessly loaded so that it extended from the side of the truck at an angle to the direction in which the truck was moving. This is seen from the following description given by the court:

> "One of the pipes, weighing 150 pounds, thus extended, diagonally, overhung the side of the truck, beyond the body line, from 12 inches to 2 feet. * * * The space in the cartway so occupied by the truck and trailer would include its normal width, plus the distance the pipe in question projected beyond the body line, in all approximately from 8 to 10 feet. * * * We regard the movement and space in front of the projection in the same light as the space in front of the truck itself. As described by some of plaintiff's testimony, the case has all the aspects of a frontal collision, where a man is standing in the highway and a driver runs him down."

As the truck passed a pedestrian standing at an intersection waiting to cross the street, the pipe struck her on the head causing serious injuries. The plaintiff in *Barzen v. Kepler* was riding in a car when it ran into timbers protruding from the rear of a truck which had stopped on the highway at night. Neither truck nor timbers were lighted in any way at the time of collision. Clearly, these cases presented no principles unique to extended and pivoting loads. *Denny v. Strauss* involved a horse-drawn wagon which, as it proceeded west along the street, swerved suddenly to the south so that a ladder projecting from the rear swung north. The ladder struck and damaged plaintiff's car which was parked on the north side of the street.

In all three of the above cases, the plaintiff's conduct was altogether proper and he had a legal right to be where he was. To borrow the phraseology used by the majority, the struck vehicles had lawfully reached the positions in which they were struck. Not so in the instant case. Plaintiff's action in turning into the left or passing lane of 20th Street was in direct violation of A.R.S. § 28–726 which provides, *inter alia:*

> "No vehicle shall at any time be driven to the left side of the roadway under the following conditions:
>
> * * * * * *
>
> 2. When approaching within one hundred feet of or traversing any intersection or railroad grade crossing."

That plaintiff was in fact driving on the "left side of the roadway" within one hundred feet of an intersection is established by undisputed testimony. His car came to rest only two feet from the left edge of 20th Street and only 35 feet north of the intersecting street. The point of impact and the scuff marks were all to the left of the center line. These facts leave no doubt that plaintiff was in the

wrong lane; furthermore, he was acting in disregard of A.R.S. § 28–730 which prohibits following other vehicles more closely than is "reasonable and prudent," having due regard for their speed and for highway conditions.

Plaintiff's conduct thus amounted to a statutory violation and as such constituted negligence per se. See Alabam Freight Lines v. Phoenix Bakery, 64 Ariz. 101, 166 P.2d 816 (1946); Pacific Employers Ins. Co. v. Morris, 78 Ariz. 24, 275 P. 2d 389 (1954), involving collisions where one vehicle was on the wrong side of the road. There can be little doubt that A.R.S. § 28–726 was designed to protect against the intersectional hazards created by traffic turning on and off the highway. It would hardly be contended that defendant was liable had the truck been making a left turn off 20th Street and been struck by the plaintiff in his effort to pass. I see no sound reason for a different result merely because defendant was turning right instead of left and the pole trailer obeyed its natural and obvious proclivity to swing across the highway.

An entirely different case is presented when the pivoting load strikes a vehicle coming on from the opposite direction. Such was the case in Callahan v. David M. Oltarsh Iron Works, Sup., 112 N.Y. Supp. 1102 (1908), characterized by the majority as "virtually the accident before us in slow motion and in miniature." Again it is clear that plaintiff there was well within his rights; the burden in such a situation is upon the turning driver to complete the maneuver safely. But surely any driver of minimum experience recognizes the obligation of *following* vehicles to slacken speed or even stop if necessary to permit the vehicle ahead to make a safe turn off the street.

We have consistently held that a defendant driver who is acting within the law has the right to assume that other drivers will do likewise. Henderson v. Breesman, 77 Ariz. 256, 269 P.2d 1059 (1954); Nichols v. City of Phoenix, 68 Ariz. 124, 202 P. 2d 201 (1949). It is true that his right to do so is not absolute and once it becomes clear that the other driver will not or cannot comply with the law, there is a duty to take avoiding action. This latter principle has been given effect most often in cases involving collisions at intersections where defendant had the right of way, and is expressed as the doctrine of "last clear chance." See Egurrola v. Szychowski, 95 Ariz. 194, 388 P.2d 242 (1964). That doctrine is inappropriate, however, where, as here, defendant had no opportunity to avoid the effect of plaintiff's misconduct. Odekirk v. Austin, 90 Ariz. 87, 366 P.2d 80 (1961).

While certain other conduct of plaintiff might constitute specific acts of contributory negligence, *viz.*, the failure to heed or even see the red flag on the pole, or

the truck driver's signal, I would willingly leave such matters to the jury. But never before has this court gone so far as to declare that a plaintiff may recover even though his unquestioned breach of a statute amounted to negligence per se.

According to the majority opinion, the jury might find that reasonable care by the power company required use of a helper or a follow up car. The jury might indeed so find. And had such precautions been adopted, they might still conclude that reasonable care required even further safety measures; a warning car proceeding in advance of the load, for example, as well as one following behind; or attempting to move the pole only during those hours in which traffic is least congested. They might find that reasonable men would not attempt to move a pole of these dimensions on this type of rig at all, despite the express sanction of the legislature.

The question before us, however, is what the jury could reasonably find; what issues the trial judge could properly submit to the jury. It is established by the record and conceded by the majority that the pole trailer met the statutory specifications for such vehicles; that a red flag was properly attached to the pole; that the driver signaled his intention to turn. Moreover, when he commenced his turn the truck was moving at a speed of only five miles per hour—so slowly that after the collision it was stopped within a distance of three or four feet.

Our decided cases are replete with denunciation of jury speculation. See, *e. g.*, Alires v. Southern Pacific Co., 93 Ariz. 97, 378 P.2d 913 (1963). The law has always provided standards for the guidance of trial judges in determining whether a jury question is presented. Foremost among these is the rule stated in Ong v. Pacific Finance Corp., 70 Ariz. 426, 222 P.2d 801 (1950), to the effect that when the evidence establishes no "probative facts" from which negligence of defendant, or any causal relation between any acts of defendant and plaintiff's injury may be found, a verdict is properly instructed for defendant. The same rule was again announced and followed in Bogard G.M.C. Co. v. Henley, 92 Ariz. 107, 374 P.2d 660 (1962). And in Butane Corp. v. Kirby, 66 Ariz. 272, 187 P.2d 325 (1947), this court declared: "It is not sufficient that the facts are such that [negligence] might have existed. It must appear affirmatively that it did."

No "probative facts" which "affirmatively" tend to show negligence on the part of defendant can be found in the present record. On the other hand, uncontroverted evidence establishes plaintiff's disregard of positive law as the sole proximate cause of injury. The judgment should be affirmed.